CHARLES G. SHELLEY, APPELLANT, V. GEORGE P. TUCKERMAN ET AL., APPELLEES.

FILED FEBRUARY 6, 1909.    No. 15,445.

Landlord and Tenant: LIEN ON CROPS: SALE: BONA FIDE PURCHASER. In an action in equity by a landlord to establish a lien by contract upon the proceeds of the sale by the tenant of certain crops in the hands of a grain dealer, evidence examined, and *held* to sustain the finding of the trial court that the buyer paid the purchase money to the tenant without notice of the plaintiff's claim.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed.*

*Tibbets & Anderson, E. P. Holmes* and *G. L. DeLacy,* for appellant.

*Burkett, Wilson & Brown* and *Hall, Woods & Pound,* contra.

LETTON, J.

This is an action in equity brought by the plaintiff against the defendants Tuckerman to recover rent for a

certain tract of land leased to them by the plaintiff, and against the defendants Barber & Sons to enforce a lien on the proceeds of the sale of the crop produced upon the land. By the terms of the lease between Shelley and Tuckerman the tenants agreed to give a chattel mortgage upon the crop not later than June 15 of each year to secure the payment of the rent for that year. As to the defendants Barber & Sons, it is charged that they are grain dealers, and that in 1905 they purchased from the Tuckermans a portion of the crops from the farm, with full notice and knowledge of the terms of the contract affecting the property, and that they refused to pay the plaintiff the proceeds of the sale. Trial was had, and judgment rendered against the Tuckermans for the amount of the rent; but the court found specifically in favor of the defendants Barber & Sons, and found that immediately after the purchase and delivery of the grain to them, and without notice of the claim of plaintiff, they paid over the purchase money to the other defendants. The cause was dismissed as to the defendants Barber & Sons. From that portion of the decree dismissing the case as to the Barbers, plaintiff appeals.

The sole contention of the plaintiff is that the judgment is not sustained by the evidence. The only point in dispute between the parties is as to whether or not Barber & Sons had notice of the nature and extent of the claim of lien made by the plaintiff upon the crop. In the case of *Sporer v. McDermott,* 69 Neb. 533, it was held by a divided court that an agreement to execute, after they are growing, a mortgage upon crops may be enforced specifically in equity if the circumstances so justify, and that it is no objection to such an agreement that the crops referred to were not in being when it was made. In that case it appeared that one defendant sold the crop to the other with the fraudulent purpose of defeating the lien, and not in good faith, and that the buyer before the purchase knew of the seller's fraudulent intention and purpose, and knew that the plaintiff claimed a lien on

the crop for the rental of the land. In this case there is no contention made that there was any fraudulent purpose upon the part of the buyers, but their liability is predicated upon the assertion that the plaintiff through his agent, Theodore Stanisics, before the purchase gave them full notice of all the facts and of the provisions of the lease. It is claimed this was done in conversations with Mr. Ernest Barber, a member of the firm of Barber & Sons.

Mr. Stanisics, the plaintiff's agent, testifies that on the 15th of June, 1904, after Tuckerman had refused through his attorney, E. W. Brown, to execute a chattel mortgage, he went to Barber & Sons; that he saw Ernest Barber, and showed him the papers he had asked to have signed and told him the circumstances. That the year before, when he leased the place to Tuckerman, he told him that the lease called for giving a mortgage of $1,500 on all the crops, that "we had a lease, and we expected them to see that we got our money; that we had really a chattel mortgage; that the lease was virtually a chattel mortgage on all the crops raised"; that he did not see him again after that until the next year; that after June 15, 1904, he had several conversations with Barber asking for a settlement; that in one of these talks Barber stated that if there was any controversy he would keep the money until settlement, and that this conversation was after the crop was delivered. On cross-examination he testifies that, although the lease was for the year 1903, as well as 1904, and the grain was sold to Barber & Sons in 1903, yet Barber never paid him any money for grain under the lease of that year; that the note was paid to him directly by Mr. Brown for the Tuckermans. He further testifies that after the 1904 corn was sold Mr. Barber told him he would turn the money over to Wilson & Brown, the attorneys, who had said they would protect him. Mr. A. S. Tibbets, one of the plaintiff's attorneys, testified that before the suit was begun he went to the place of business of Barber & Sons, and saw one of the younger members

of the firm, who stated to him that Stanisics and the Tuckermans had got into a controversy as to whom the money belonged; that they had held it for some time, but had finally turned it over ·to Wilson & Brown, under the assurance from Wilson & Brown that Shelley had no lien upon the crops, and that the lease was simply one that provided for a lien in the future, and that you could not mortgage crops in the future.

For the defendants Mr. Ernest Barber testified that he bought the 1904 corn and paid Tuckermans $1,075.10 for it; that he had never seen any lease between Shelley and the Tuckermans; that prior to the time he bought the corn he had a few conversations with Stanisics, and that Stanisics asked him in a friendly way to help him collect his rent out there. He asked him to hold the money, and told him that he thought they would try to beat him out of his rent, and appealed to him on the ground that he had sold Barber lots of grain; that he had no knowledge that Stanisics claimed a lien upon the corn by virtue of a provision in the lease until after the money was paid, and that he, Barber, never had a clear idea about the Stanisics' claim until he talked to Judge Tibbets about it. As to this he says that Tibbets explained to him the nature of the claim, and referred him to a case, and asked him to pay the money in order to avoid a lawsuit, and that this was the first time that he had definite notice so that he understood the claim. He testifies that he did not know the grain had been delivered to his elevator at Denton until Mr. Brown, Tuckermans' attorney, called him up over the telephone and demanded the money, and stated that Stanisics or Shelley had no legal claim on the money in question, and that he then notified the agent at Denton to pay the check. He further denies that he had any conversation with Stanisics after the corn was delivered and before he paid the money. He says that he has no recollection of any conversation with Stanisics such as he describes on June 15, and never saw the papers he

speaks of, and never heard of any such agreement to make a mortgage until after the purchase and payment of the money. On cross-examination he says that he knew that Stanisics was claiming that the money was to go to him, but that he did not make any statement as to his legal rights; that he would not have paid the money over if he had known that Stanisics claimed to have a lien either in the form of a chattel mortgage or in the form of an agreement in the lease to give a chattel mortgage. He denies that Stanisics stated that he based his claim upon any chattel mortgage or an agreement under a chattel mortgage, and says he claimed he was entitled to the amount because the men were on his farm, and he wanted to collect his rent, and wanted Barber to help him. On recross-examination he testifies that he cannot remember of Stanisics telling him that he had a lease and of the provisions of the lease, and to the best of his belief he did not do so.

It is incumbent upon the plaintiff to establish that when the defendants Barber & Sons bought the crop they had such notice and knowledge of the lien claimed by the plaintiff as to place them in the same position as the Tuckermans with respect thereto. The plaintiff's claim rests almost entirely on the testimony of Mr. Stanisics. The main points are denied by Mr. Barber. While the testimony of Mr. Barber is not as positive and direct as it might have been, yet, not having the witness before us, it is impossible to tell what weight and effect as regards his credibility should be given to his manner of answering the questions. Experience has taught the writer that whether an answer is positive, direct and unequivocal, or not, often depends upon the temperament and mental habits of the witness. Some individuals will make a positive affirmation or denial, where another equally truthful, or perhaps more worthy of belief, will give his testimony in a halting and hesitating manner, and perhaps will not seem to be sure of anything, yet the testimony of the careful, cautious and hesitating witness

will, as a matter of fact, often be entitled to more weight than that given by a more positive, direct and self-confident one. It is clear that Barber knew that Stanisics expected the rent to be paid from the sale of the crop, but this is what the landlord usually expects. Knowing the imperfections of memory as to the exact words of conversation, we are disposed to adopt the view of the trial court as to the explanation by Mr. Barber of his talk with Judge Tibbets. In fact, there is but little' difference in their recollection, except that Tibbets says that in the talk it appeared to him that Barber knew of the lease provisions previously, while Barber swears he never knew the facts until he learned them from Tibbets in this conversation.

Upon the whole question as to whether or not the buyers had such notice or knowledge of the rights of the plaintiff as to charge them equally with the Tuckermans, we believe the trial court, perhaps knowing the parties, and with the great advantage that actual presence of the witness gives, had a much better opportunity of forming a correct judgment as to their respective credibility than we have, and we think his conclusions are entitled to consideration. We are satisfied from the whole record that the complaint of appellant that the findings of the trial court are not sustained by the evidence is not well founded, and we are of opinion that this court would not be justified in reversing his findings upon that point.

For these reasons the judgment of the district court is

AFFIRMED.