STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V. FARMERS & MERCHANTS BANK OF WESTON, E. H. LUIKART, RECEIVER, APPELLANT: CHARLES H. SLAMA, INTERVENER, APPELLEE.

FILED MAY 15, 1934. No. 28960.

*James L. Brown, Clinton J. Campbell, F. C. Radke, Barlow Nye* and *Schiefelbein & Donato,* for appellant.

*H. H. Wilson, Charles H. Slama* and *H. A. Bryant,* contra.

Heard before Goss, C. J., Good, Eberly, Day and Paine, JJ., and Tewell, District Judge.

Paine, J.

From a decree canceling the note of the intervener, and requiring the receiver of the Farmers & Merchants Bank of Weston to deliver the note to the intervener, the receiver appeals.

Charles H. Slama, intervener and appellee, a resident of Wahoo, Nebraska, alleges in his petition of intervention, filed August 3, 1931, that F. J. Kirchman was president of the Saunders County National Bank at Wahoo, and also president of the Farmers & Merchants Bank of Weston, Nebraska, and was a stockholder and director in both of said banks; that on Sunday, January 19, 1930, said Kirchman telephoned for the intervener to come right down to the Saunders County National Bank, and when he arrived Kirchman requested a favor of him. Kirchman told him that the Saunders County National Bank had a second mortgage of $10,000 on a half-section of land owned by Wilhelmina Hruby, which had been past due since November 1, 1929, and that the bank had been ordered by the examiner to either foreclose said mortgage or charge it off; that the surplus and undivided profits were not sufficient to charge the mortgage off from its books, and that the bank disliked to foreclose the mortgage against the maker thereof, who had been an old friend and good customer. Thereupon, Kirchman begged

intervener to take an assignment of the mortgage and foreclose it in his own name. Intervener replied to Kirchman that he was not in the market to buy any second mortgage, having no available funds, and Kirchman said he did not expect any cash, but would replace the assignment of mortgage in the bank's assets by notes, which he had already prepared, and dated them the day before, and that intervener's notes would be kept in the bank until a decree of foreclosure was obtained, and upon intervener then assigning the decree of foreclosure to the bank, said notes would be returned at once to the intervener. Mr. Slama, as well as citizens generally, had at that time entire confidence in said Kirchman, who had been in the banking business in one location in Wahoo for 45 years prior thereto. Intervener asked to see the mortgage, and Kirchman said he did not have it available, but would deliver it the next day. That, relying upon the representations of said Kirchman, the intervener signed the three notes for $3,000 each, and one note for $1,000, all prepared in advance by Kirchman, for which notes he was to receive the assignment of the $10,000 mortgage. That intervener called for the mortgage the next day, but found Kirchman too busy to attend to it, and did not actually receive the assignment of the mortgage until February 11, 1930, and immediately upon examining the title discovered an existing second mortgage of $6,000 against one of the quarters of land, in favor of the Nebraska State Savings Bank, operating in the same room as the Saunders County National Bank, and of which Kirchman was also president, and when his attention was called to this $6,000 mortgage, Kirchman agreed to have it released at once. That, relying upon all of these representations, the intervener brought a petition for foreclosure of the $10,000 mortgage upon February 14, 1930, subject to the first mortgage thereon of $24,000. That all three banks mentioned herein failed on April 15, 1930, and a decree of foreclosure upon intervener's petition was entered April 22, 1930, after which date he learned that

said Kirchman had failed to release the $6,000 mortgage, as promised, and demanded of the receiver that some of his $10,000 notes be returned to him, or the $6,000 mortgage released. That the receiver of the Nebraska State Savings Bank refused to deliver any of his notes, and refused to release the $6,000 second mortgage.

The intervener states that in April, 1930, seven banks in Wahoo and vicinity closed, and that he was beset with an enormous amount of labor, with investigations of numerous clients who were depositors and investors in said banks, and also by demands made upon him personally by reason of his being surety on several bonds for F. J. Kirchman, and that he suffered ill health thereafter, which accounts for his delay in filing the petition of intervention. That after the failure of the banks, the intervener found that the said Kirchman had made one of the notes payable to the Farmers & Merchants Bank of Weston in the sum of $3,000.

The intervener alleges that, promptly upon discovering the fraud, he informed the receiver of the bank of Weston of all the facts herein, and that he had received no consideration for said $3,000 note, and that said note was procured by fraud, deceit, and misrepresentation of the president of said bank, and the intervener asked that the note be canceled and delivered up by the receiver of said bank.

The receiver, for answer to the petition of intervention, admits that Kirchman was the president of both banks, and charges that, since acquiring knowledge of the alleged fraud practiced upon him by Kirchman, the intervener had made payments upon both principal and interest of the other three notes, which, with the note held by the receiver of the Farmers & Merchants Bank of Weston, all constituted one and the same transaction, and that by his conduct the intervener has ratified and affirmed the transaction with Kirchman, which was, in effect, an absolute purchase by Slama of the Hruby $10,000 mortgage. That if Kirchman, as president of the Nebraska State Savings

Bank, agreed to release the $6,000 mortgage, then it should be released by the receiver of that bank, and the receiver of the bank of Weston prays that the receiver of the Nebraska State Savings Bank be made a party and be ordered to release the $6,000 mortgage, and that the court render judgment against the intervener for the sum of $3,000, with interest at 7 per cent. from January 18, 1930, to July 18, 1930, and at 10 per cent. thereafter.

For reply the intervener alleged that, without his consent, Kirchman wrongfully transferred three of said notes to innocent purchasers for value, one for $3,000 to the State Bank of Swedeburg, of which Mr. Kirchman was only a director, and that he transferred the $1,000 note and a $3,000 note to the Federal Reserve Bank; that the intervener, after convincing himself that he had no defenses as against the holders of these three notes, paid off the $3,000 note to the State Bank of Swedeburg in full, and paid to the Federal Reserve Bank the $1,000 note in full, and $1,200 on the $3,000 note held by said Federal Reserve Bank.

At the trial the intervener testified that he had been attorney for the Saunders County National Bank for more than eight years. He then related at length how Mr. Kirchman had called him to the bank on that Sunday morning, January 19, 1930, and urged him to do the bank a favor by taking an assignment of the Mrs. Hruby $10,-000 mortgage because it was not good advertising for the bank to foreclose it, and because her family had been very friendly with Kirchman; that Kirchman definitely promised to keep the four notes, which he then signed, for $10,000 there in the bank, and just as soon as the decree of foreclosure was secured and assigned to the bank his four notes would be returned to him, and in addition agreed to pay him the same attorney fee as though the foreclosure had been brought in the name of the bank; that when the intervener asked Kirchman for the note and mortgage he said it was locked up in the vault, and that he would send it up to him the next day,

and that he did not receive it the next day, and telephoned on several different days to Mr. Kirchman to send it up, but did not receive it until the middle of February. Intervener testified that he did not notice that the four notes he signed, amounting to $10,000, were not all payable to the same bank, but that one was payable and drawn on the blank of the Farmers & Merchants Bank of Weston, Nebraska, and another was payable to the State Bank of Swedeburg. Intervener testified that it was agreed that the notes would lie there in the bank, and not be negotiated, and that they were to be returned to him when the decree was signed. He testified that the Weston bank gave him no consideration for the note in question. The witness F. J. Kirchman testified that the bank examiner had objected to the Hruby mortgage, and directed that it be eliminated from the bank's assets, and that he had no means of eliminating it from the bank's assets, and got the intervener to accommodate him by executing four notes, on his agreement that he would see that the intervener lost nothing by the transaction. He admitted that he had the four notes all prepared before the intervener arrived at the bank that Sunday morning. Kirchman testified that in the foreclosure, so far as outward appearance was concerned, intervener was acting for himself, but that in reality he was acting for the bank. Kirchman denied that anything was said about assigning the decree, but testified that it was his intention to take the decree off from the intervener's hands as soon as things shaped themselves so he could get back intervener's notes. He said he told the intervener, "We will see that you don't lose anything by this transaction; it is an accommodation for the Saunders County National Bank and you will not be injured financially;" and admitted that he intended to so bind the National Bank, although he said that the agreement was not put in writing, which he now regretted, and said that his nephew, W. H. Kirchman, cashier of the bank, also knew all about the transaction. While being cross-examined, he was

handed exhibit 4, which was the written agreement covering this whole matter, signed by himself, his nephew, W. H. Kirchman, and Charles H. Slama, and then admitted that he had forgotten all about drawing up or signing this exhibit, which was also dated on Saturday, January 18, the same as the notes, and not on Sunday, January 19, when the transaction actually took place in the private office of F. J. Kirchman.

1. While this case is not free from doubt, and while the tragedy which resulted from the failure of an entire line of banks, under practically the same management, has brought untold loss to the depositors and many customers, who purchased questionable securities, represented to be good, yet each case which reaches this court must be determined upon the facts definitely proved in that particular case.

After a careful study of the evidence, including the exhibits in the case at bar, we are convinced that the intervener did not enter into a fraudulent deal with F. J. Kirchman. The intervener already owed the bank a large sum of money; he did not go to the bank that Sunday morning to buy a $10,000 mortgage; he went there as the attorney who had for many years been counsel for the bank. He was told that the examiner required that a past-due mortgage of $10,000 must be charged off or foreclosed. The bank's condition was such that it could not be charged off, hence it must be foreclosed. But it was against a friend of Kirchman, who was a valued customer of the bank, and she was also a widow. Kirchman wished to keep the bank's name out of the foreclosure suit, saying it would be poor advertising for the bank, and the intervener was persuaded to put in $10,000 worth of his personal notes, take an assignment of the mortgage, and immediately bring foreclosure, upon Kirchman's specific promise to return him his notes in exchange for the assignment of the decree of foreclosure. To make it still more clear that Slama is not more than a holder of the

naked title, a written memorandum, exhibit 4, executed at the time the notes were signed, provided that Kirchman would pay all the costs in connection with the foreclosure, including attorney's fees. If this was a *bona fide* sale of this mortgage, as claimed by the receiver, why should the bank agree to pay all costs, and also an attorney's fee to the intervener?

Viewed in this light, there was nothing crooked or fraudulent in the transaction, and Kirchman could have immediately reported to the examiner that he had followed his direction, and turned the mortgage over to the bank's attorney for action, and, to avoid a foreclosure in the bank's name, arranged to have the foreclosure brought in the name of the attorney.

The attorney for the intervener also stresses the point that the receiver has failed to prove that any depositor will suffer if the receiver is defeated in this action.

It was held in *First State Bank v. Hare,* 152 S. W. (Tex. Civ. App.) 501, that a bank which accepts a note obtained in negotiations conducted by its president cannot deny that he represented the bank in the transaction. To the same effect is an Iowa case. A cashier was required to hold stock in his bank, and a certificate was made out to Cashier Hambright, and paid for by his note, with the agreement that it would be carried by the bank without interest as long as he remained its cashier. He had also renewed this note. When he ceased to be cashier, the bank brought suit on the note. The defendant proved that the agreement included the condition that when he ceased to be cashier the certificate of stock would be returned to the bank, and his note returned to him. The bank alleged that Davis, its president, had no authority to make any such an agreement. The trial court held that, at most, it was a private deal between the president and cashier, and that this would not affect the note. Upon appeal, the appellate court reversed this decision, and held that the bank was not an indorsee holding title, but was

the original payee of a note secured by its president, who testified that, in making the transaction, he was acting in behalf of the bank. The holding in the first paragraph of the syllabus was: "A principal cannot ratify so much of the unauthorized act of its agent as it thinks to its advantage and repudiate the remainder." *Security Savings Bank v. Hambright*, 193 N. W. 576 (195 Ia. 1147).

2. Section 94, Restatement, Agency, says: "An affirmance of an unauthorized transaction may be inferred from a failure to repudiate it." And in the same authority, at section 104, the law is declared to be: "Although there is no ratification, a person on whose account another acts or purports to act may become a party to a transaction similar to the original transaction by manifesting consent, or he may become subject to liability for the value of the benefits received as a result of the original transaction." *Division No. 1, Railway Employees' Department, A. F. L., v. American State Bank*, 113 Neb. 196; *Security State Bank v. Schomberg,* 119 Neb. 598; *Brownell v. Ruwe*, 117 Neb. 407.

The receiver insists that a corporation is not chargeable with the knowledge, nor bound by the acts, of one of its officers in a matter in which he acts in behalf of his own interests, and deals with the corporation as a private individual, and in no way represents it in the transaction, citing *Koehler v. Dodge*, 31 Neb. 328; *Buffalo County Nat. Bank v. Sharpe*, 40 Neb. 123.

But a careful consideration of all the evidence leaves little doubt that Kirchman, in taking this $3,000 note directly to the Weston bank, was acting for that bank. The cashier of that bank, Ferdinand Pacal, testified that, when he received the note in suit by mail, he gave credit on his books to the Saunders County National Bank, which had charged the note to his bank on its books, and that, in a talk with Mr. Kirchman prior to the failure of the two banks Mr. Kirchman told him that this note of the intervener would be taken up as soon as the foreclosure of the Hruby mortgage took place.

The trial judge wrote a long memorandum opinion, which discussed many features of the case at length, and we desire to set out two paragraphs found therein, as follows:

"It would seem to be rather clear that a president of a bank accepting a security knowing that it was defective and not an enforceable obligation would bind his bank by his knowledge of the fact. The cases cited by the receiver on this point concede that where the officer is acting for the bank his knowledge is imputed to the bank.

"Another contention of the receiver is that the president of the National Bank, as such, had no authority to make an agreement with Slama that he would not be required to pay the notes. This may be conceded as a general rule that where the bank parts with value for a note the president has no authority to release the note except upon payment. But the transaction with intervener was clearly within the implied authority of the president and the manager of the bank, in an arrangement whereby intervener was employed to assist the bank in collecting the asset represented by the Hruby mortgage, and the method employed contravenes no principle of law or ethics."

We are indebted to the receiver for furnishing us the full opinion of Judge Redick in his brief.

We are able to reach no other conclusion than that it would be unjust to allow the Weston bank to take advantage of that part of the transaction only by which it secured this note, and relieve it from the remainder of the same agreement. Finding no error in the judgment of the trial court, the same is hereby

AFFIRMED.